## Smith v. Phillips

*Susan P. Halpern,* for plaintiff.
*Thomas P. Muldoon Jr.,* for defendant Pennsylvania Financial Responsibility Assigned Claims Plan.

HILL, *J.,* October 28, 1991—Plaintiff has made a claim for uninsured motorist benefits and medical payments under the Pennsylvania Assigned Claims Plan. Plaintiff has alleged that on February 26, 1989, he was the occupant of an uninsured 1976 Plymouth 4-door station wagon parked at 2709 54th Drive, Philadelphia, Pa. Plaintiff was in a stooped position in the back seat cleaning the floor when the left side of the Plymouth was sideswiped by another vehicle, owned by William Phillips and driven by an unidentified driver. As a result of the accident plaintiff testified he "hit the floor" and remained there for 20 minutes. Tom Magee, a witness for plaintiff who lived at 2709 54th Drive and owned the station wagon, testified that plaintiff got out of the vehicle within a few seconds of the impact. Plaintiff contradicted himself as to whether he lost consciousness as a result of the accident and in other ways.

Since the striking vehicle was also uninsured, plaintiff's claim became the responsibility of the Pennsylvania Assigned Claims Plan. Under this plan eligible claimants may recover a total of $15,000 for uninsured motorist benefits, including a maximum of $5,000 for medical payments.

Following the accident plaintiff was treated by Dr. Robert J. Trollinger, M.D., a family medical practitioner, for a strain and sprain of the cervical and lumbosacral spine, soft tissue injuries to the left shoulder, a decrease in the range of motion of the shoulder and concussion. Dr. Trollinger has submitted bills for $7695 for approximately 93 visits from February 28, 1989 to October 25, 1989, plus X-rays and orthotic appliances. Plaintiff claims pain and suffering for his injuries. The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) Plaintiff was in the back-seat area of a 1976 four-door Plymouth station wagon at the time it was sideswiped by a vehicle operated by an unidentified driver, at approximately 2 p.m. on February 26, 1989. At the time of the accident the Plymouth was parked along the curb in the vicinity of 2709 54th Drive, Philadelphia, Pa.

(2) Plaintiff's testimony that the accident caused him to "hit the floor" and that he remained on the floor for 20 minutes was contradicted by the testimony of Tom Magee, his own witness. Mr. Magee testified that immediately following the noise of the accident he looked out the window, saw the striking vehicle pull away and observed plaintiff "getting up out of the back seat holding his neck." (N.T. 142-43, 146-47, 151.) The court finds that plaintiff was not on the floor for 20 minutes nor anywhere near it but remained in the vehicle for only a few seconds after the accident.

(3) Plaintiff's version of the manner in which his body was moved around in the Plymouth by the force of the accident and the final position of his body as a result of the accident is conflicting and not convincing.

(4) The court finds that plaintiff did not hit the floor of the Plymouth as a result of the accident or remain there for any period of time but, in fact, plaintiff got out of the vehicle almost immediately thereafter.

(5) Plaintiff's testimony is conflicting, inconsistent and not convincing with respect to whether he lost consciousness immediately following the accident. The court finds that in fact plaintiff did not lose consciousness as a result of the accident.

(6) Plaintiff's testimony as to whether he had dreams following the accident was inconsistent. At one point plaintiff testified that he never had dreams about the accident; thereafter, plaintiff testified that he had suffered nightmares as a result of the accident; later in his testimony plaintiff stated that he was not anxious following the accident but immediately thereafter testified that he probably was anxious following the accident. The court finds that plaintiff did not have nightmares because of the accident and further finds that plaintiff did not suffer undue special anxiety because of the accident.

(7) Plaintiff failed to produce any photographs of the damage to the 1976 Plymouth and there is no evidence concerning the extent of the damage except that there were dents on the doors of the Plymouth. There is also evidence that the vehicle was suitable for driving following the accident.

(8) The court finds that plaintiff sustained some pain and suffering from the injuries to his lower back, neck and left shoulder but the court is unable to find by a fair preponderance of the credible evidence that it was

as serious as the plaintiff testified to or that it required the amount of treatment rendered by Dr. Trollinger.

(9) Following the accident plaintiff was treated by Dr. Robert J. Trollinger, M.D., a family medical practitioner, from February 28, 1989 to and including October 25, 1989. During this eight-month period (239 days or 34 weeks and 1 day), Dr. Trollinger treated plaintiff on 93 separate occasions. These visits and charges were as follows:

A. Initial examination ($150)
   & physical therapy ($40)                         $  190
B. 86 combined office visits (each $35)
   & physical therapy sessions (each $40)    $6,450
C. 1 combined office visit ($35)
   injection ($25)
   & physical therapy sessions ($40)           $  100
D. 5 physical therapy sessions ($40)
   without office visits                              $  200

*Total*                                                   $6,940

(10) In addition to the charges referred to in (9), Dr. Trollinger charged an additional $320 for X-rays of the dorsal spine ($70), cervical spine ($90), lumbosacral spine ($110) and left shoulder, ($50) and prescribed the following orthotic appliances:

| | |
|---|---|
| Lumbosacral brace | $125 |
| Cervical collar | $ 25 |
| Cervical pillow | $ 35 |
| Bed board | $125 |
| Thermophor | $125 |
| *Total* | $435 |

(11) In addition, Dr. Trollinger referred plaintiff to an orthopedist, Dr. Corey Ruth, M.D., who saw plaintiff on five occasions: an initial visit on May 6, 1989, for $190

(Dr. Ruth reviewed X-rays on the same date for an additional $50), three visits at $90 each ($270), and one visit at $85, for a total charge of $595.

(12) The purpose of visiting Dr. Ruth was simply to confirm the diagnosis of Dr. Trollinger.

(13) The court finds that in addition to the initial visit on February 28, 1989, for which Dr. Trollinger charged $190, there were 92 subsequent visits averaging $73.36 each, exclusive of X-rays and appliance costs.

(14) The court finds that Dr. Trollinger's charge was excessive and unreasonable and that 93 visits were unnecessary for the proper resolution of plaintiff's injuries for the following reasons:

(a) The injuries for which Dr. Trollinger basically treated plaintiff were strain and sprain of the cervical and lumbosacral areas of the spine, tenderness of the area in the left shoulder and decreased range of motion therein.

(b) Dr. Trollinger never discussed his charges with plaintiff and plaintiff never inquired Dr. Trollinger as to what his charges were. Dr. Trollinger simply sent a bill of $7695 to plaintiff's law firm at the termination of treatment.

(c) The court believes that a discussion between Dr. Trollinger and plaintiff would have taken place concerning the charges but for the fact that there was a prospect that they would be paid by virtue of benefits plaintiff might be entitled to under the Pennsylvania Motor Vehicle Financial Responsibility Act, Assigned Claims Plan or some other source (other than plaintiff). At one point when the court asked Dr. Trollinger what he would have charged had there been no prospect of insurance, the answer was a vague inconclusive response preceded by considerable hesitation.

(d) The charges in question ($7,695) were never submitted to the Department of Public Assistance despite the fact that the charges for non-automobile accident related ailments (nerves, hypertension, gastritis, a fistula and colds) that the plaintiff had been suffering from prior to the accident and after it were charged to that agency.

(15) Dr. Trollinger told plaintiff to come back every other day or so, excluding Sundays and a period of four weeks (May 23 to June 21, 1989), when plaintiff visited his brother in Virginia.

(16) During the 30-day period (May 23 to June 21, 1989), when plaintiff was in Virginia and was not being treated by Dr. Trollinger, he testified that he was "feeling good." (N.T. 128.) Despite this, plaintiff returned immediately to Dr. Trollinger upon his return from Virginia and continued to see him on the same basis for approximately four more months. Furthermore, plaintiff's forward bending was found by Dr. Trollinger to be "within normal limits" during this period. (N.T. 63.)

(17) The court finds that there was no valid explanation as to why plaintiff had to be sent to Dr. Ruth for more than one examination since the purpose of the visit was to confirm Dr. Trollinger's diagnosis. Dr. Ruth, incidentally, did not confirm the diagnosis with respect to shoulder tenderness.

(18) There was no explanation to justify the charge of an additional $35 for "office visit" on 86 different occasions when physical therapy sessions were also given at a charge of $40. In addition, the court cannot find that all of this therapy was necessary.

(19) Based on a careful review of all the evidence in this case, the court is unable to find that Dr. Trollinger was a convincing witness and the court, therefore, declines to accept his testimony concerning the necessity for all the treatment he gave to plaintiff in this case.

(20) The court is unable to find by a fair preponderance of the credible evidence that more than 15 physical therapy visits at a charge of $40 each were required for the proper resolution of plaintiff's injuries.

(21) The court is unable to find by a fair preponderance of the credible evidence that more than five office visits at a charge of $35 each were required for the proper resolution of plaintiff's injuries.

(22) The court is unable to find by a fair preponderance of the credible evidence that the X-ray of plaintiff's dorsal spine which was taken at a charge of $70 was necessary for the proper resolution of plaintiff's injuries.

(23) The court is unable to find any evidence as to why a thermophor at a cost of $125 was necessary for the proper resolution of plaintiff's injuries.

(24) The treatment given to plaintiff by Dr. Trollinger which the court finds reasonable and necessary under all the circumstances is limited to the following:

| | |
|---|---|
| Initial examination & physical thearpy treatment session | $ 190 |
| 13 additional physical therapy treatments at $40 each | $ 520 |
| Four office visits at $35 each | $ 140 |
| X-rays ($320 less $70) | $ 250 |
| One injection at $25 | $ 25 |
| Orthotic appliances ($435 less $125) | $ 310 |
| *Total* | $1,435 |

(25) The treatment given to plaintiff by Dr. Ruth which the court finds reasonable and necessary under all the circumstances is limited to $150 for the first visit. There is no evidence that Dr. Ruth's bill was presented to the Department of Public Assistance.

(26) The court is unable to award any damages for medical expenses for reasons set forth in the conclusions of law and discussion, *infra,* but has set forth what it believes to be the correct damages for medical treatment (24, 25) in the event that further proceedings may be necessary.

(27) The court finds that plaintiff is entitled to the sum of $3,000 for pain, suffering and inconvenience.

(28) Under section 1702 of the Pennsylvania Motor Vehicle Financial Responsibility Act (75 Pa.C.S. §1702), a claimant who has been personally injured in an accident with an unidentified motor vehicle must report the accident "to the police or proper governmental authority." Defendant contends that plaintiff did not report this accident to the police. The court finds that in fact the accident was reported to the police.

## CONCLUSIONS OF LAW

(1) The Pennsylvania Assigned Claims Plan (75 Pa.C.S. §1752) governs the responsibility of a designated assignee of the plan to pay benefits to injured persons who meet the requirements for eligibility as set forth in section 1752 thereof. Travelers is the designated assignee in this case.

(2) Under section 1752 of the plan a person is eligible to recover benefits from the plan if he or she meets several requirements. Plaintiff meets these requirements.

(3) Section 1755(b) of the Assigned Claims Plan entitled "Coordination of Benefits" states as follows:

"(b) *Accident and health benefits* — All benefits an eligible claimant receives or is entitled to receive as a result of injury from any available source of accident and health benefits shall be subtracted from those benefits available in section 1753."

(4) In the case at bar plaintiff, by his own admission, was entitled to receive medical assistance benefits from the Department of Public Assistance. The court finds that plaintiff has forfeited any medical benefits under the Assigned Claims Plan because neither he nor Dr. Trollinger, his physician, submitted the bills for his treatment (referred to in findings of fact 9 and 10) to the Department of Public Assistance for a decision by them as to whether they should be paid by that agency.

(5) Title 62 Pa.C.S. §443.3, entitled "Other medical assistance benefits," states as follows:

"Payments on behalf of eligible persons shall be made for other services, as follows:

"(1) Rates established by the department for outpatient services as specified by regulations of the department adopted under Title XIX of the Federal Social Security Act consisting of preventive, diagnostic, therapeutic, rehabilitative or palliative services: furnished by or under the direction of physician....

"(2) Rates established by the department for (i) other laboratory and X-ray services prescribed by a physician ... and furnished by a facility other than a hospital which is qualified to participate under Title XIX of the Federal Social Security Act, (ii) physician's services consisting of professional care by a physician in his office."

Section 443.4, entitled "Additional services for eligible persons other than the medically needy," states:

"Except for the medically needy, persons eligible for medical assistance may, pursuant to regulations of the department, also receive ... palliative or therapeutic services prescribed by or provided under the direction of a physician...."

(6) Whether plaintiff is considered medically needy and/or a person eligible for medical assistance under the

Department of Public Welfare's standards, he was nonetheless entitled to receive palliative, therapeutic and/or rehabilitative services from Dr. Trollinger and the bills should have been submitted first to the Department of Public Assistance. Since this procedure was not followed, defendant is not obliged to pay the medical bills in question.

(7) The question boils down to whether medical assistance from the Department of Public Welfare is a benefit within the meaning of section 1755(b).

(8) In *Grant v. Travelers Insurance Co.*, 343 Pa. Super. 310, 494 A.2d 862 (1985), the Superior Court held that the value of a health maintenance organization entitlement, which was denied due to the uninsured motorist's failure to obtain medical treatment from physicians and/or facilities approved by the HMO in accordance with the requirements of the HMO plan, may be subtracted from "loss" in calculating basic loss benefits to be paid an uninsured motorist by the assigned claims plan assignee, which in that case was Travelers Insurance Co.

The Superior Court stated that although the plaintiff in that case was not entitled to HMO benefits due to failure to comply with certain requirements, he was nevertheless barred from collecting them from the assigned claims plan. The court stated:

"[S]he sacrificed her entitlement by failing to act in accordance with the terms of her HMO plan. Had appellee actually received the benefits afforded by her HMO, appellant (PACP) would have possessed an indisputable right of set-off for the amount of the benefits received, pursuant to subsection 108(a)(3). To now deny appellant of a set-off right because of appellee's own willful failure to properly secure her HMO entitlement, appears to us to be an unreasonable result." *Grant, supra.*

(9) See discussion hereinafter set forth.

## DISCUSSION

Plaintiff contends that *Grant, supra,* does not apply in this case because:

"[H]ad the drafters of the MVFRL (more specifically, the portion relating to the PACP) intended to include the DPW as an available source of benefits it would have so stated." (Plaintiff's brief at 3.)

In effect the same argument was made in *Grant* where the plaintiff in that case argued that an HMO is not a traditional insurance carrier and therefore is not the type of provider of "benefits or advantages" to which section 108(a)(3) of the Pennsylvania Assigned Claims Plan, 40 P.S. §1009.108(a), applied.

That section states:

"(3) If an individual receives basic loss benefits through the assigned claims plan for any reason other then because of the financial inability of an obligor to fulfill its obligation, *all benefits or advantages that such individual receives or is entitled to receive as a result of such injury,* other than life insurance benefits or benefits by way of succession at death or in discharge of familial obligations of support, *shall be subtracted from loss in calculating net loss."* (emphasis in original)

In rejecting plaintiff's argument in *Grant,* the Superior Court noted:

"[T]hat the regulations promulgated by the Insurance Department state that any HMO, approved by the Insurance Department, qualifies as a source of 'collateral benefits' for the purposes of an insured's primary coverage election. 31 Pa. Code §66.53(c)(4)(v). We are unable to discern any reasonable rationale for differentiating HMO benefits from other types of 'benefits or advantages' for the purposes of subsection 108(a)(3). Indeed the lan-

guage of that subsection impliedly lends itself to a liberal interpretation of 'all benefits or advantages' in computing net loss. Compare 40 P.S. §1009.206(a) [of the original No-Fault Act now repealed]." *Grant, supra.* (emphasis and bracketed section added)

No regulation has been brought to the court's attention to the effect that medical payments made by or through the Department of Public Welfare are also a source for the purposes of an insured's primary coverage election. Furthermore, plaintiff contends that a claimant such as plaintiff would be required by virtue of a lien imposed by law [62 P.S. §1409(b)(1)] to reimburse the Department of Public Welfare for medical assistance payments made to him because of an accident, had he received such assistance from DPW and thereafter recovered from the Assigned Claims Plan for the same medical payments. Plaintiff contends that because of this it would make no sense to deny plaintiff his right to recover his medical bills in this case due to his failure or the failure of Dr. Trollinger to first present them to DPW for payment, as he has done with other non-accident related medical bills for treatment by Dr. Trollinger prior to and subsequent to the accident in question.

Despite the absence of an Insurance Department regulation qualifying medical assistance payments as a source for the purpose of an insured's primary coverage election, this court, in the language of *Grant*, "can discern no reasonable rationale for differentiating" such benefits "from other types of 'benefits or advantages' for the purposes of subsection 108(a)(3)." As *Grant* states, subsection 108(a)(3) "impliedly lends itself to a liberal interpretation of 'all benefits or advantages' in computing net loss." Medical assistance payments are certainly "benefits," or, if "loans" as plaintiff asserts to be the case (plaintiff's brief at 2), they are nonetheless "ad-

vantages." Indeed, the language of this phrase is all-embracing.

Accordingly, the court concludes that plaintiff's failure and/or the failure of Dr. Trollinger and Dr. Ruth to submit the bills in question first to the Department of Public Welfare is a bar to his present claim for medical benefits.

Plaintiff is entitled only to the sum of $3,000 for pain, suffering and inconvenience (see finding of fact 27).

## ADJUDICATION

And now, October 28, 1991, following a non-jury trial heard on June 4, 1991, and the submission of briefs, the court adjudicates an award of $3,000 in favor of plaintiff and against defendant Pennsylvania Financial Responsibility Assigned Claims Plan. A further adjudication is entered in favor of defendant William T. Phillips and against plaintiff.